FRANK ARMSTRONG, JR. TRUST for the Benefit of Frank ARMSTRONG, Jr., and Estate of Frank Armstrong, Jr., Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. Civ.A. 5:98CV00101.

United States District Court, W.D. Virginia, Harrisonburg Division.

Jan. 10, 2001.

Charles S. McCandlish, Harrison & Johnston, Aubrey J. Owen, Owen & Truban, Winchester, VA, for Plaintiffs.

Julie C. Dudley, U.S. Attorney's Office, Roanke, VA, Angelo Frattarelli, U.S. Department of Justice, Washington, DC, for Defendant.

## MEMORANDUM OPINION

MICHAEL, Senior District Judge.

Before the court are cross motions for summary judgment in, what the court hopes to be, the final chapter of three lawsuits brought in this court between the same parties regarding the same series of transactions. By order of the court, the above-captioned civil action was referred to the presiding Magistrate Judge, B. Waugh Crigler, for proposed findings of fact and a recommended disposition. The Magistrate returned his thorough Report and Recommendation on February 24, 2000, to which the plaintiffs timely filed objections. Accordingly, the court has performed a *de novo* review. *See* 28 U.S.C. § 636(b)(1)(C).

The court has spent considerable time parsing through the myriad of pleadings, memoranda, and opinions relating to the 1991 and 1992 stock transfers from Frank Armstrong Jr. to his children and grandchildren. The relevant tax laws appear simplistic when compared to the facts and legal arguments presently before the court. The tortuous chain of events, including a multiplicity of lawsuits, subsequent to the stock transfers serve to obscure that which is truly relevant. However, the more familiar the court becomes with the actual facts ensnared in the web of information, the more inescapable the court's conclusion that the plaintiffs cannot possibly prevail in the instant lawsuit.

## I.

Frank Armstrong Jr. ("Armstrong") was the primary shareholder of National Fruit Products, Inc ("NFP"). In 1991, Armstrong, then ninety-one years of age and suffering from recurring pulmonary problems, kept company with at least two young women—not related by blood or marriage—to whom Armstrong had given gifts of real estate. Furthermore, Armstrong's will in 1991 had certain uncommon provisions regarding his power of attorney. For these reasons, Armstrong's children were concerned that Armstrong might act in such a manner as could serve to the detriment of NFP or Armstrong's descen-

dants. Accordingly, the children and Armstrong, with extensive legal consultation, devised a series of stock transfers that would completely divest Armstrong of his interest in NFP. The Armstrong's contemplated that the children and grandchildren would benefit from these transfers in lieu of an inheritance from Armstrong.

The transfers of NFP stock from Armstrong to his children and grandchildren, which were calculated to occur in two different tax years, took place on December 26, 1991 and January 3, 1992. The specific details of all of Armstrong's 1991 and 1992 stock transfers and the trusts created in conjunction therewith need not be recounted herein, as they have been in other opinions in related cases. *See, e.g., Armstrong v. United States*, 7 F.Supp.2d 758 (W.D.Va.1998) [hereinafter *Armstrong I* ]. The court shall only discuss that which is necessary to the understanding of this particular lawsuit, for such information is sufficiently imposing without the added distraction of superfluous facts.

On January 6, 1992, in conjunction with the transfers, Armstrong created the Frank Armstrong, Jr. Trust for the benefit of Frank Armstrong, Jr. ("Grantor Trust"), naming his son, Frank Armstrong, III as Trustee. Armstrong died on July 29, 1993, leaving the Estate of Frank Armstrong, Jr. ("Estate"). Frank Armstrong, III is the Executor of the Estate. The Grantor Trust and the Estate are the plaintiffs in the instant lawsuit.

The factual and legal bases for the plaintiffs' claims for refund of all gift taxes will be discussed in greater detail in the remainder of the opinion. However, the central theme of this litigation is the plaintiffs' argument that the donees' assumption of potential gift and estate taxes, and the costs associated therewith, reduced the value of Armstrong's gifts of stock, but such reduction in value has yet to be considered by the government in assessing the gift tax.

In conjunction with the transfers, the donee children entered into the Transferee Liability Agreement ("Agreement") with Armstrong on January 3, 1992. By the terms of the Agreement, Armstrong agreed to report the value of the NFP stock at $100 per share and pay the attendant gift taxes thereon, and the children assumed liability for any additional gift taxes that may arise from any valuation of the stock in an amount exceeding $100 per share. The donee children also assumed any professional costs and litigation expenses arising from the potential additional gift tax.

Armstrong duly filed gift tax returns for the 1991 and 1992 gifts to his children, valuing the stock at $100 per share and paying all gift taxes based on that figure. After the transfers, the NFP corporate ledger reflected the donee children and grandchildren as the owners of the stock, and Armstrong no longer had any voting rights in NFP. Armstrong claimed no residual value in the NFP stock in his tax returns, nor did the Estate report any interest in NFP stock.

In 1995, the Internal Revenue Service (IRS) valued the NFP stock on the dates of the 1991 and 1992 transfers at $109 per share, and assessed additional gift taxes accordingly. Although the donee children assumed liability for payment of this additional gift tax in the Agreement, the additional gift tax was paid by the plaintiffs. The plaintiffs herein seek a refund for the additional gift tax paid, asserting that the stock was overvalued at $109 per share. The plaintiffs also seek a refund of the initial gift taxes paid for the 1991 and 1992 gifts, asserting multiple reasons in support of their overall legal theory that the amount of the gift was improperly evaluated. The plaintiffs do not specifically suggest what amount would reflect the proper value of the gifts. However, the plaintiffs seek a full refund of all gift taxes paid, which amounts to over $4,000,000.

By all accounts, the plaintiffs and the donee children were counseled extensively by several attorneys who specialize in

trusts and estates prior to the transfers. The plaintiffs and donees were informed of the possible tax consequences of the gifts. The attorneys projected the potential gift and estate taxes based on several scenarios related to the timing of Armstrong's death. The plaintiffs and the donee children were aware that payment of the gift taxes would leave Armstrong's estate relatively insolvent and, therefore, incapable to pay any additional gift taxes, estate taxes, or professional and litigations costs in association therewith. The donee children were also informed that, pursuant to the Agreement and by operation of the tax laws, they would be personally liable as transferees for certain tax obligations.[1] All parties also knew that the gifts were in lieu of any inheritance that the children and grandchildren may have otherwise hoped to acquire one day. Despite all of the potential consequences, the children wanted to divest Armstrong of his interest in NFP, so they accepted the gifts and the known potential liabilities associated therewith. Then, the contemplated events happened, in that the IRS assessed additional gift taxes and Armstrong's death incurred estate taxes. These events triggered gift and estate tax transferee liability and professional and litigations costs associated therewith.[2] The court finds it not at all insignificant that, after extensive advice from counsel, the plaintiffs (through their individual representatives) undertook a series of suspiciously confusing transactions and are now suing for relief from their own meticulously crafted transactions.

## II.

Both the plaintiffs and the defendant have moved for summary judgment Summary judgment is appropriate only if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c). The non-moving party is to have the credibility of all its evidence presumed. *See Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir.1990). Where both parties move for summary judgment on the same count, the credibility of the non-movant's evidence will be assumed when considering the movant's argument. "[S]ummary judgment or a directed verdict is mandated where the facts and the law will reasonably support only one conclusion." *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir.2000) (quoting *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 356, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991)).

## III.

A preliminary determination that must be made is whether the court has subject matter jurisdiction over the plaintiffs' claims. In order for a district court to exercise jurisdiction over a civil action for a claim of refund, the plaintiff must first duly file a claim for refund with the Secretary of the Internal Revenue Service, in accordance with the provisions of law and the federal regulations. *See* 26 U.S.C. § 7422(a). The regulations direct that any claim for refund, in order to be considered as such, "must set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof." 26 C.F.R. § 301.6402–2(b)(1). These rules have been interpreted as creating a "substantial variance" rule, which prohibits a taxpayer's civil action on any grounds or

---

1. Nonetheless, several donees sued in Tax Court challenging the transferee liability imputed to them by operation of the tax code. *See Armstrong v. Comm'r of Internal Revenue*, 114 T.C. 94, 2000 WL 222818 (2000) [hereinafter *Armstrong II* ].

2. The litigious activities of the plaintiffs and donees have, no doubt, created substantial professional and litigation costs. Much of these costs were avoidable as evidenced by the fact that, as herein, most of plaintiffs and donee claims have been dismissed on summary judgment. *See Armstrong I*, 7 F.Supp.2d 758; *Armstrong II*, 114 T.C. 94, 2000 WL 222818.

factual support which substantially vary from the grounds and facts set forth in the administrative refund claim. *See Lockheed Martin Corp. v. United States*, 210 F.3d 1366, 1371 (Fed.Cir.2000).

The defendant challenges the court's subject matter jurisdiction over three of the plaintiffs' six counts. The three counts challenged on jurisdictional grounds are Count III, alleging express or implied trust of stock, Count V, challenging the marketability of the stock, and Count VI, alleging that Armstrong retained power to revoke the transfer of stock.[3] The defendant contends that these claims are barred because the plaintiffs failed to set forth grounds and facts in support of these counts in their administrative claim for refund, thereby preventing the court from exercising jurisdiction.

The requirement that a party set forth all grounds and factual support for claims of refund at the administrative level serves to allow the I.R.S. the opportunity to consider and dispose of claims without the expense of litigation. *See Beckwith Realty, Inc. v. United States*, 896 F.2d 860, 862 (4th Cir.1990). A "ground" for a claim is a legal theory upon which a refund is claimed. *See Burlington Northern, Inc. v. United States*, 231 Ct.Cl. 222, 684 F.2d 866, 870 (1982). The Fourth Circuit has interpreted the relevant statutes and regulations as requiring that a claim for refund "contain sufficient information to allow the Commissioner to address the merits of the dispute." *See Beckwith*, 896 F.2d at 862. The requisite specificity of a refund claim prevents the Commissioner from having to "hazard a guess" as to a taxpayer's claim for relief. *See id.* (quoting *Stoller v. United States*, 444 F.2d 1391, 1393 (5th Cir. 1971)). Thus, the court must determine whether the plaintiffs' claims for refund alleged sufficient grounds for relief, and facts in support thereof, to permit the

plaintiff's to proceed to the merits of their claims in this action.

A.

In Count III, the plaintiffs allege that an explicit or implicit trust was created at the time of transfer, thereby reducing the value of the gifts. The plaintiffs' claim for refund never specifically alleged that there was an explicit or implicit trust. However, the facts in support of the argument that there exists an explicit or implicit trust were alleged. Thus, the question is whether the ground for relief asserted below substantially varies from the count now challenged.

Amidst a thicket of unnecessary labels, convoluted legal theories, and accusations that it is others who misunderstand the relevant law, the plaintiffs claim that their ground for relief is that the "amount of the gift" was improperly calculated because certain liabilities and encumbrances thereon reduced the value of the gift, but were not considered by any party in making a valuation. From the plaintiffs' asserted ground for relief (overstatement of the value of the gift), and facts in support thereof (liabilities and encumbrances), arise the counts of the instant lawsuit, including allegations of liens or transferee liability at law (I), assumption of obligations (II), trust (III), and incomplete transfers (IV). Unlike other cases that have barred civil actions for failure to assert fully a claim at the administrative level, *see, e.g., Miller v. United States*, 949 F.2d 708, 712 (4th Cir.1991) (holding that taxpayer cannot establish a refund claim by imputing, but not actually providing, factual knowledge to the I.R.S.); *Beckwith*, 896 F.2d at 863 (holding that stated disagreement with audit assessment, without more insufficiently details grounds for relief); in the instant matter, the Commissioner was apprised of all of the relevant

---

**3.** The complaint sets forth each of its six counts in two nearly identical sections, the only difference being the date of the relevant transfers (December 26, 1999 or January 3, 1992). For the sake of simplicity, the court herein addresses each count in a singular fashion, but has considered the transfers from both years.

facts and the theory that the transfer created certain liabilities and encumbrances on the gifts, thereby reducing the value of the gifts and, consequently, reducing the amount of gift taxes due. Accordingly, the Commissioner was notified of the possibility that a claim of express or implied trust could be asserted and should not now be surprised by the plaintiff's contentions regarding existence of a trust. Accordingly, the court shall adopt the recommendation of the Magistrate Judge to deny the defendant's motion for summary judgment as to Count III for lack of subject matter jurisdiction.[4]

### B.

■ Unlike the plaintiffs' claim of an express or implied trust, there is substantial variance between the administrative refund claim and Count V, Marketability of Stock. Count V asserts a ground for relief that is based on facts other than those asserted in the administrative refund claim. Failure of the plaintiffs to assert in detail the claim of marketability at the administrative level prevents this court from exercising jurisdiction over the same in a civil action. *See* 26 U.S.C. § 7422.

The plaintiffs contend that the marketability count, like the other counts of this lawsuit, presents a reasonable argument in light of the administratively asserted ground for relief that the amount of the gift was miscalculated. However, whereas claims of liens, obligations, trust and incomplete transfer may reasonably be asserted based on claims of liabilities and encumbrances "created by" the transfers of stock, marketability may not.

In Count V, the plaintiffs contend that stock has nominal value, due in part to lack of market for the same. The court agrees with the Report and Recommendation of the Magistrate Judge that there is

a qualitative difference between claiming reduced value and claiming nominal value, or essentially, no value at all. Every paragraph in the plaintiffs' often redundant administrative claims for refund, included in its first sentence some minor variation of the following: By reason of donor's taxable gifts in [1991, 1992] certain [liabilities/encumbrances] were created with respect to [estate/gift] taxes.... Thus, the plaintiffs explicitly argued that the reduction in value of the gift was caused by liabilities or encumbrances *created* by the transfers. If the stock of a closely held corporation lacks a market, this is not a situation created by the transfers, but rather is a consequence of the economic market. The plaintiffs' administrative refund claims are devoid of factual evidence in support of the argument that the value of the stock was reduced by anything other than encumbrances or liens created in the course of the transfers. Accordingly, the plaintiff cannot herein raise new factual reasons to support their theory of improper valuation of the gifts. *See, e.g., Miller v. United States*, 949 F.2d 708, 712 (4th Cir.1991) ("taxpayer cannot establish a refund claim by imputing, but not actually providing, such knowledge or information to the IRS"). Thus, the Report and Recommendation shall be adopted as to granting the defendant's motion for summary judgment on Count V, based on lack of subject matter jurisdiction.

### C.

■ Count VI alleges that Armstrong retained the right to revoke the transfers, in part or in whole, thereby triggering liability of the donees to fulfill Armstrong's financial obligations. In their administrative claim for refund, the plaintiffs asserted, among other things, that Armstrong reserved and retained the right to require payment of his tax obligations by the do-

---

4. The court notes that the defendant did not object to the recommendation of the Magistrate Judge to assert subject matter jurisdiction over Count III. Although the defendant's objection to a portion of a Report and Recommendation is what triggers the requirement of a *de novo* review, *see* 28 U.S.C. 636(b)(1)(C), issues of jurisdiction are paramount. Accordingly, the court has performed a *de novo* review of this issue.

nees. While there is no explicit administrative claim of a right of revocation, the repeated allegations of liabilities and encumbrances beyond the control of the donees put the IRS on notice of the possibility of an argument alleging that a right of revocation reduced the value of the gifts. *See infra*, Part III–A. Accordingly, contrary to the Magistrate's recommendation and over the defendant's objection, the court finds that it has subject matter jurisdiction over Count VI, with respect to amount of the gifts.

The court notes that the motion of the defendant and the recommendation of the Magistrate with respect to Count VI gave the court considerable pause. However, the court has determined that it is the outlandish nature of the allegations in Count VI that have triggered the response opposing exercise of jurisdiction. The court shall herein assert subject matter jurisdiction over Count VI and the merits of the count, or lack thereof, shall be considered *infra*, footnote 8 and accompanying text.

### D.

■ To the extent that the counts of the complaint in this action (barring Count V) support the plaintiffs' administratively asserted legal theory as to the amount of the gifts, and supporting factual arguments of liabilities or encumbrances on the gifts, the court shall exercise jurisdiction. *See* 26 U.S.C. § 7422; 26 C.F.R. § 301.6402–2(b)(1). However, the plaintiffs also seek to challenge whether the transfers in fact, constitute an *inter vivos* gift. There is an undeniable difference between the legal theory that the amount of a gift was improperly valued, and the theory that there was, in fact, no gift. In defending against the defendant's challenge to the court's subject matter jurisdiction, the plaintiffs repeatedly assert, oftentimes underlining the phrase, "amount of gift" as the legal ground asserted in the administrative refund claim. Furthermore, each and every paragraph of the refund claims began with the phrase, "By reason of donor's taxable *gifts* ..." (Emphasis added). Although the facts in support of the plaintiffs' argument that there is no gift may be the same as the facts in support of the arguments regarding the amount of the gift, these are two different grounds for relief. The plaintiffs' failure to assert in the administrative claim the ground that there was no valid gift is fatal to the plaintiffs' present assertion of this ground. *See* § 7422; § 301.6402–2(b)(1). The plaintiffs' own unwavering reference to the transfers as gifts throughout the refund claim process indicate their acceptance of the fact that the transfers were gifts, while maintaining a challenge to the valuation of the gifts. The Commissioner had no reasonable opportunity to assess the legal theory that the transfers were anything other than gifts at the administrative level and is not expected to hazard a guess as to what additional grounds for relief a taxpayer would like to assert based on the same set of facts. Accordingly, because the sole ground for relief asserted below seeks a refund based on the amount of gift, the court has no jurisdiction to consider arguments on any other legal theory. Specifically, the court shall not entertain arguments in support of a legal theory that challenges the very existence of a gift. To the extent that any of the remaining counts (I–IV, VI) seek a refund based on a theory other than amount of gift, they shall not be considered. Accordingly, the court turns to the merits of the arguments regarding the amount of the gift, on all remaining counts.

### IV.

The plaintiffs' theory of relief is that the amount of the gift, i.e. the value of the stock, was overvalued. According to the plaintiffs, the donees' assumption of potential gift and estate taxes, and the costs associated therewith, reduced the value of the gifts by creating certain liabilities and encumbrances, in the form of liens and transferee liability at law (I), express or

implied assumption of Armstrong's obligations (II), explicit or implicit trusts of stock (III), incomplete transfers of stock (IV), and retained power of revocation (VI). Each of these counts alleges a different way by which purported donee gift or estate tax liability reduced the value of the gifts. The ability of the alleged gift and estate taxes to reduce the amount of the gift is critical to each count. Thus, rather than address each count individually, the court must first address in turn the arguments regarding gift and estate tax liability.

### A.

A preliminary understanding of operation of the gift tax laws is critical to comprehension of this lawsuit. Thus, the court herein undertakes to provide a cursory review of the relevant gift tax laws, before proceeding to the merits.

### 1.

The tax code imposes a tax on the transfer of property by gift for each calendar year. *See* 26 U.S.C. § 2501(a). When property is transferred for anything less than adequate and full consideration in money or money's worth, it shall be subject to a gift tax. *See* 26 U.S.C. § 2512(b). Whether the gift is made in trust or otherwise, given directly or indirectly, the gift tax applies. *See* 26 U.S.C. § 2511(a). The value of a gift of property on the date the gift is made shall be considered the amount of the gift. *See* § 2512(a). Pursuant to the tax code, the payment of the gift tax is the responsibility of the donor. *See* 26 U.S.C. § 2502(c).

The law is clear that a gift is measured by the value of the property at the time of transfer from the donor to the donee(s). *See* 26 U.S.C. § 2512(a); *Robinette v. Helvering*, 318 U.S. 184, 186, 63 S.Ct. 540, 87 L.Ed. 700 (1943). A gift tax, which is an excise tax on the power to transfer the property, is assessed at the moment of the

transfer. *See* 26 C.F.R. § 25.2511–1. The value of the gift is the present fair market value of the gift in the hands of the donor at the time of the transfer and such value is unaffected by subsequent enhancements or depletions in value in the hands of the donee. *See id.* at 25.2512–1.

### 2.

In this case, Armstrong fulfilled his gift tax obligations based on his reported valuation of the gifted stock at $100 per share. As previously explained, through the Agreement, the donee children assumed liability for any of Armstrong's gift tax obligations flowing from a valuation of the stock in excess of $100 per share. Thus, at the time of the gift, the donee children accepted the possible future liability of additional gift taxes, contingent upon whether the I.R.S. valued the stock at over $100. Neither Armstrong nor the donees had any power to affect the potential valuation of stock by the I.R.S. at over $100 per share. The plaintiffs contend that the existence at the time of the gifts of the possibility that the IRS could value the stock above $100 and trigger additional gift tax liability reduced the value of the stock.[5] The defendant counters that this potential liability was too speculative to affect the value of the gifts at the time of transfer.

■■ Although the gift tax is assessed on the donor, it is possible for donees to assume liability for the donor's gift tax obligations. *See, e.g.,* Rev.R. 75–72 (setting forth IRS formula for calculating gift tax to be paid by donee), *Diedrich v. Commissioner of Internal Revenue*, 457 U.S. 191, 102 S.Ct. 2414, 72 L.Ed.2d 777 (1982) (holding that donee assumption of gift tax constitutes income to the donor). To the extent that a donee agrees at the time of transfer to pay the donor's gift tax obligations, this could be considered adequate consideration for money's worth, thereby reducing the value of the gift. *See* 26

---

**5.** The heart of the plaintiffs' argument is that the possibility of a determination that the

stock is *more valuable* than the donor estimated, *decreases* the value of the stock.

U.S.C. § 2512(b) (gift is only the property for which the donor does not receive adequate consideration in money or money's worth); *see also Harrison v. C.I.R.*, 17 T.C. 1350, 1952 WL 227 (1952) (holding that obligation to pay tax where the imposition of said tax was a certainty, although the amount was uncertain but estimable, could reduce the amount of the gift). This "net gift" situation did not occur in the transfers between Armstrong and the donee children and grandchildren because the gift tax liability incurred by the donee children in the Agreement was speculative at best. *See Harrison*, 17 T.C. at 1355 (distinguishing gift reduction for definite tax liability from speculative contingencies). Unlike a situation where the parties valued the stock at the time of transfer at $100 per share and the donee children agreed to assume liability for gift taxes on a specific portion of the thereof, the Agreement only speculated as to future liability and created no lien or encumbrance on the value of the stock at the time of transfer. *See Ripley v. C.I.R.*, 105 T.C. 358, 367, 1995 WL 655347 (1995) (finding no reduction on the value of a gift where donees subject to no definite liability at the moment of transfer) *rev'd on other grounds*, 103 F.3d 332 (4th Cir.1996). Much like *Ripley* and unlike *Harrison*, the gift tax liability of the donee children was entirely speculative at the time of the transfers and not subject to any reasonably calculable estimation. Not only was the possibility of an additional gift tax assessment purely conjectural, but, in the event that additional gift taxes were to be imposed, the amount of such an assessment was unpredictable. The fact that parties are now aware that the contingency of the imposition of an additional gift tax occurred, and have knowledge of the amount, cannot cure the speculative nature of the potential liability at the time of the transfer.

Furthermore, the court notes that, although the gift tax-triggering contingency occurred, the donees did not pay the additional gift tax as called for in the Agreement. The additional gift tax was paid by the plaintiffs. This non-payment of the gift tax by the donee children serves as further evidence that the potential gift tax liability assumed by the donee children was not only speculative, but illusory. Even though the liability-triggering event occurred, the donee children incurred no tax burden because the plaintiffs paid the additional gift tax. With respect to the assumption of costs related to the additional gift tax, the court notes that the donee children, in their individual capacities, are not parties to this lawsuit. The plaintiffs, the Grantor Trust and the Estate, have submitted no evidence to the court that the donees have incurred any financial liability as a result of the additional gift tax. All the court has before it is the Agreement, which purports to transfer liability for gift taxes to the donee children, and the stipulated fact that the donee children did not pay the gift tax as called for in the Agreement. Accordingly, even if the speculative nature of the transferee liability would otherwise have served to reduce the amount of the gift, the evidence that the Agreement apparently has not been enforced further convinces the court that the Agreement can have no affect on the valuation of the gift.

The potential gift tax liability, and costs associated therewith, purportedly assumed by the donee children in the Agreement, were too speculative to create a lien or encumbrance on the gift in any of the ways described in Counts I, II, III, IV and VI. Consequently, this potential gift tax liability had no effect on the value of the gift, and shall trigger no gift tax refund.

### B.

Much like the argument regarding the potential gift tax liability, a preliminary understanding of the estate tax laws is critical to understanding the plaintiffs' arguments regarding estate tax liability as a basis for finding an improper valuation of the gifts. Thus, the court shall herein undertake a cursory review of the relevant

estate tax laws, before proceeding to the merits.

1.

The tax code imposes a tax on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States. *See* 26 U.S.C. § 2001(a). Accordingly, upon Armstrong's death, the government assessed an estate tax.[6] The estate tax is computed based, in part, on the value of the estate. *See* § 2001. In determining the value of the estate, section 2035 of the tax code bears particular relevance in the instant matter. Section 2035(b), the so-called "gross up" rule, requires the gross estate to be increased by the amount of any gift tax paid by the decedent or his estate on any gift made within the three year period immediately preceding the decedent's death. Accordingly, tremendous estate tax consequences flowed from the timing of Armstrong's death. When Armstrong died in 1993, the gross-up rule required that the amount he paid in gift taxes for the 1991 and 1992 transfers—over $4,000,000—be added to his gross estate. The practical implication of adding the amount paid in gift taxes to the gross estate is that the amount paid in gift taxes will now be subject to the estate tax.

The fact that an estate subject to the gross-up rule may likely be insolvent by virtue of the gifts transferred within three years of the decedent's death did not escape the attention of the drafters of the Internal Revenue Code. Section 6324(a)(2) of the tax code imposes personal liability for a decedent's unpaid estate taxes on transferees of property that is subject to the gross-up rule. To put these rules in the context of this case, section 2035 subjects the amount of gift taxes paid for the 1991 and 1992 transfers of stock to an estate tax. Section 6324(a)(2) requires that, if the Estate does not timely pay the estate tax, the donee children and grandchildren, as recipients of the gifted stock, pay the estate tax. The purpose of these tax rules is to enhance the Commissioner's ability to collect unpaid estate taxes where the taxpayer (the decedent/estate) has rendered himself insolvent by giving away the vast majority of his assets within three years of his death. *See Armstrong II*, 114 T.C. at 102. Although the transferees are personally liable, their liability extends only to the amount of the value of the gift received. *See* § 6324(b). Thus, none of the transferees of Armstrong's stock can be liable for his estate taxes in an amount greater than the value of the stock they received.

This cursory review of the gross-up rule and its affect on the estate tax fleshes out the plaintiffs' motivation for seeking a reduction in the amount of the gifts. In this case, the gross-up rule has caused the value of the estate to be taxed to increase in excess of $4,000,000 (the amount paid in gift taxes on the 1991 and 1992 transfers). Thus, in addition to the obvious benefit from receiving a refund of all or some portion of the gift tax, the additional, and not insubstantial, benefit would be to reduce greatly the amount of the gross estate, upon which the estate tax is calculated.

2.

The plaintiffs' argue that liens or encumbrances were created on the gift by reason of the potential estate tax liability assumed by the donees, thereby reducing the value of the gift. That operation of the tax laws subjected the donees to potential estate tax liability is clear as a matter of law. *See Armstrong II*, 114 T.C. at 100 (holding upon plain reading of relevant tax laws, Armstrong donees are liable as transferees).[7] The donee children and

---

**6.** Not surprisingly, the plaintiffs' legal challenge to the amount of estate tax assessed is pending in the Tax Court as of the date of this opinion (Docket No. 1118–98).

**7.** The court notes that the applicability of the transferee liability law, § 6234, to the donees is critical to the plaintiffs argument that the donees accepted potential estate tax liability, thereby reducing the value of the estate. In a classic example of playing both sides of the

grandchildren, like any gift recipient, could incur § 6324 liability from acceptance of the gifts because Armstrong's death within three years of the gifts could trigger the gross-up rule and increase Armstrong's estate taxes for which, by operation of law, the donees would be liable. However, for the same reasons that the speculative assumption of gift tax liability did not create a lien or encumbrance on the gift at the time of transfer, explained *infra*, Part IV–A, neither did the possibility of future estate tax liability reduce the value of the gift.

 Furthermore, the precise issue of transferee liability incurred by operation of the tax code, specifically § 6324, has been decided by other courts in favor of the defendant's position. See *Ripley*, 105 T.C. at 367–68. In *Ripley*, the Tax Court explained in detail that the potential for tax code transferee liability does not create an encumbrance on the gift at the time of transfer. See *id*. Although, upon incurring transferee liability, a lien is created on the property in the hands of the donee, such lien does not extend to a third party purchaser. See § 6324(b). Thus, the potential lien does not affect the fair market value of the shares at the time of transfer, which is how and when the value of the shares is determined. See 26 C.F.R. § 25.2512–1; *Ripley*, 105 T.C. at 368.

Finally, in addition to the basic principles that the contingent future liability of the estate tax does not affect the present value of the gift at the time of the transfer, there is an overarching flaw in the plaintiffs argument that the court cannot ignore. Almost every gift recipient is potentially liable for transferee liability of estate taxes, because every donor could die within three years.[8] Were the court to accept the plaintiffs' argument that this potential liability reduces the value of the gift in some undeterminable amount,[9] no gift's value could be fixed until at least three years after the transfer. For only after three years would it be known whether transferee liability did, in fact, reduce the value of the gift. This argument must fail for several reasons.

First, such a result squarely conflicts with section 2512, which states that the amount of a gift is determined by the value at the time of transfer, not in the hands of the donee three years later. Second, permitting a reduction in value based on a contingent future liability runs contrary to the goals of the tax code. In the case of the transferee liability for estate taxes, the contingent event is the death of the donor in three years (and the estate's failure to pay the gift tax). Thus, the plaintiffs argument is that the value of the gift is reduced by the possibility that the donor

fence, the donee children, including Frank Armstrong III, sued in tax court that the transferee liability law did not apply to them.

**8.** In Count VI, the plaintiffs go so far as to allege that Armstrong controlled the timing of his own death, thereby creating a right of revocation and reducing the value of the gift to each donee. Specifically, the plaintiffs plead in their complaint that each gift was "subject to a power retained by Armstrong to revoke the transfer in part or in whole by refusing to accept heroic measures and procedures for prolonging his life or by otherwise acting or refusing to act, in a manner calculated to eliminate his chances of surviving for three years after [the dates of the transfers]." After the initial shock of the plaintiff's factually unsubstantiated claim that the defendant retained the power to revoke the gift through

not accepting heroic measures to live for three years following the transfer, the court realizes that such an argument is really the only one the plaintiffs were left to assert because, by operation of law, the event that could trigger estate tax liability of the donees was the death of the donor within three years. Aside from the fact that Armstrong died within three years, yet the gifts remain in the sole possession of the donees—showing that Armstrong's alleged failure to prolong his life *did not* revoke the transfers—Count VI must fail for the reasons set forth in the accompanying text of this section of the opinion.

**9.** The plaintiffs are still unable to calculate the amount by which the assumed estate tax liability reduced the gift's value at time of transfer.

may die within three years. However, the tax code does not provide breaks for transfers made in contemplation of death, but rather ensures that such transfers are taxed in the same manner as estate taxes, so that *inter vivos* transfers are not used to circumvent estate taxes. If the court were to allow a reduction in taxes based on the possibility of death, the court would be creating an incentive to make *inter vivos* transfers in contemplation of death. Such a result would eviscerate certain carefully crafted goals of the tax code.

For all of the aforementioned reasons, the possibility that the donees could incur transferee liability of Armstrong's estate taxes did not create liens or encumbrances on the gifts in any way to reduce their value, as argued in Counts I, II, III, IV and VI.

V.

The two situations in which the donees could incur gift or estate tax liability—the increased valuation of the stock by the I.R.S. and/or the death of Armstrong within three years—were both contingent future possibilities at the time of the transfers. It was possible that neither of the liability-triggering events would occur, thereby leaving the donees to enjoy the full value of their gifts of stock. Although both events did occur, neither had any effect on the value of the gift at the time of transfer by virtue of any of the alleged liabilities and encumbrances as detailed in the counts of the complaint.

Accordingly, the Report and Recommendation shall be ADOPTED in part, and REJECTED in part; the plaintiffs' motion for summary judgment in part or in whole, shall be DENIED in its entirely; and the defendant's motion for summary judgment shall be GRANTED on all counts, but for the reasons as stated herein.